IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DERRICK WILLIAMS,

       Plaintiff,

v.                                 Civil Action No.: 3:24-CV-00696

GORDON J. PAINTER,

       Defendant.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

      COMES NOW Gordon J. Painter, a Chesterfield County Police Department ("CCPD") police officer ("Corporal Painter"), by counsel, pursuant to Fed. R. Civ. P. 12(b)(6) and Local Rule 7(F) and submits this Memorandum in Support of Corporal Painter's Motion to Dismiss.

FACTS

      On October 11, 2022, a female called 911 to report a breaking and entering in progress at her River Forest apartment located at 5741 Quiet Place Circle in Chesterfield County, Virginia. (Complaint, ECF No. 1 at ¶ 14.)  *See* Ex. 1, CAD Report for Incident PD2210110254.  The apartment in question is located on the ground level of the apartment complex, and it is accessible from a breezeway that runs between the parking lot and an open, grassy area of the complex with sidewalks.  *See generally* Ex. 2, Sergeant Hlava Body Worn Camera (BWC) video Part 1; Ex. 3, Corporal Painter BWC video; Ex. 4, Officer Claud BWC video; *See* Ex. 5, Apartment Lease Contract for 5741 Quiet Pine Circle Apt #102 (Lease); Ex. 6, Officer Wilson BWC video; Ex. 7, Sergeant Hlava BWC video Part 2; Ex. 8, Officer Cash BWC video[1] (showing layout of apartment

---

[1] The birth dates and social security numbers that appear in this video have been redacted, in accordance with Fed. R. Civ. P. 5.2.

complex and the specific apartment in question throughout the officers' BWC videos). The front door of the apartment opens to the kitchen and main living area, with a second door on the side of the apartment allowing access from the living area to the fenced-in, ground-floor patio. *Id.* A short hallway directly in front of the main entrance door leads from the main living area to a closet and hall bathroom on the left and two bedrooms off the right side of the hallway, each with windows but no other exit. *Id.*

Several CCPD officers responded to the female resident's breaking and entering call for service, including Corporal Painter and his K-9, Scout. (ECF No. 1 at ¶¶ 9, 15.) *See generally,* Exs. 2; 3; 4; 6; 7; 8 (showing several officers on scene throughout the entire incident). The female complainant reported that she had been staying in Virginia Beach since September 5, 2024, and had returned to her apartment that day to collect some of her belongings. *See* Ex. 8 at 05:33-05:41. After she unlocked the door to the apartment, she could not physically open it because the chain latch on the inside of the door was across the door. *See* Ex. 4 at 01:18-01:25. The female complainant then kicked in the door, entered her apartment, and encountered a tall black male, whom she did not know, naked in her bed and wrapped up in one of her blankets, which prompted her to run out of the apartment and call 911. (Complaint, ECF No. 1 at ¶¶ 13-14.) *See* Ex. 1; Ex. 2 at 01:50-1:55; Ex. 4 at 00:52-01:40.

The complainant advised the 911 dispatcher that she was the only person on the Lease for the apartment, that no one was supposed to be in the apartment, and that she had not given anyone permission to be in or stay in the apartment while she was gone. *See* Ex. 1; Ex. 2 at 01:55-01:58; Ex. 4 at 00:04-00:06; Ex. 7 at 00:53-01:05. A number of CCPD officers were dispatched to the 911 call for Quiet Pine and the officers responded with their emergency lights and sirens activated, allowing them to expedite their driving response given the significant nature of the call. *See* Va.

Code § 46.2-920; *see, e.g.*, Ex. 2 at 01:30-02:00; Ex. 6 at 0 0:30-01:30.  While en route, a Sergeant provided an update over the radio advising all responding to Quiet Pine that a K-9 was en route and that officers should "hold the perimeter until they get there and wait for K-9."  *See* Ex. 2 at 02:00-02:10.

After arriving on scene, CCPD officers confirmed with the complainant, who remained on scene outside the apartment waiting in a vehicle, that she had not seen the man in question, or anyone else, exit her apartment since the time she called 911.  *See* Ex. 2 at 01:20-01:26, 04:30-04:35 (officer heard over radio saying "the individual is still in her bed"); Ex. 4 at 00:15-00:20.

Acting on the complainant's representation to 911 and her confirmation on-scene directly to the CCPD officers that no one was supposed to be in her apartment and that she had no idea who this man was, CCPD officers, understanding there was a breaking and entering and burglary in progress, began to set up a perimeter around the building and at the entrance and side exit of the apartment in order to keep the suspect contained.  *See* Ex. 2 at 6:05-8:06;  Ex. 7 at 01:06-01:13; Ex. 8 at 01:28-03:55 (officers can be seen drawing their service weapons and Tasers on the perimeter of the ground-floor apartment).  Once Corporal Painter and his K-9 arrived on the scene, after being summoned by a supervising Sergeant, Corporal Painter was briefed by fellow CCPD officers on the circumstances, told where the apartment in question was located, and provided a description of the apartment's layout.  *See* Ex. 2 at 08:06-10:15; Ex. 4 at 03:50-05:00.  Corporal Painter then led K-9 Scout on lead to the front door of the apartment and, after reaching the door, Corporal Painter activated his BWC.  (ECF No. 1 at ¶ 15.)  *See* Ex. 2 at 9:20-10:15; Ex. 3 at 00:00-00:48; Ex. 4 at 04:37-05:13.

Corporal Painter and four other CCPD officers positioned themselves around the front door of the complainant's apartment, with Officer Wilson providing Corporal Painter with lethal cover,

and the other three officers tactically positioned around the entrance with their guns drawn. *See* Ex. 2 at 9:30-10:15; Ex. 3 at 00:40-00:51; Ex. 6 at 06:55-07:45.

Corporal Painter opened the door to the apartment and announced loudly "police K-9, speak to me now or I'll release the dog, if the dog finds you, you'll be bit." *See* Ex. 2 at 10:13-10:18; Ex. 3 at 00:50-00:58. There was no audible response from anyone in the apartment indicating an intent to surrender and no physical display consistent with surrendering. *See* Ex. 3 at 00:50-01:02.

Corporal Painter then shouted, "police K-9, speak to me now." *See* Ex. 2 at 10:18-10:22; Ex. 3 at 01:00-01:02. Once again, no one in the apartment showed themselves or surrendered. *See* Ex. 3 at 00:50-01:03.

Corporal Painter then yelled "anybody home?" *See* Ex. 2 at 10:22-10:25; Ex. 3 at 01:03-01:06. There was still no acknowledgement or response to Corporal Painter. *See* Ex. 3 at 00:50-01:08.

Then, Corporal Painter loudly warned a fourth time, "now's your chance; speak up." *See* Ex. 2 at 10:25-10:29; Ex. 3 at 01:06-01:08. Despite four loud and clear warnings from Corporal Painter, there was no acknowledgement or response from any individual in the apartment.

Following these four clear warnings, Corporal Painter released K-9 Scout into the apartment, commanding Scout to "find him." *See* Ex. 3 at 01:09. After Scout searched the main living area and kitchen, Corporal Painter recalled him. *See* Ex. 3 at 01:10-01:17.

Before releasing Scout again, Corporal Painter yelled a fifth command for anyone in the apartment to "come out now." *See* Ex. 2 at 10:35-10:39; Ex. 3 at 01:18-01:19. Still no one came out from the back rooms. *See* Ex. 3 at 00:50-01:22.

4

Corporal Painter released Scout back into the apartment, and loudly commanded Scout to "find him," and pointed towards the back of the apartment where the two bedrooms were located and where the claimant said she last saw the intruder. *See* Ex. 2 at 10:40-10:41; Ex. 3 at 01:20-01:26.

As K-9 Scout made his way down the short, narrow, and dark hallway of the apartment, the suspect came out of the back bedroom located off the right side of the hallway. *See* Ex. 3 at 01:26. As soon as Officer Wilson saw the suspect emerging from the bedroom, he yelled loudly at the suspect "let me see your hands" and "keep your hands up." *See* Ex. 3 at 01:27-01:30; Ex. 5 at 07:38-07:40. Simultaneous with Officer Wilson's commands, K-9 Scout bit the suspect on the upper left arm and the suspect began yelling "it's biting me" repeatedly. *See* Ex. 3 at 01:30-01:36. Corporal Painter immediately drew his firearm, activated his weapon mounted light so he could see, and started walking towards the suspect while loudly commanding the suspect to "come here" and "come to me," while Scout ensured the intruder was contained. *See* Ex. 3 at 01:30-01:36. Corporal Painter then commanded the suspect to "get on the ground" and the suspect complied while continuing to yell "it's biting me" repeatedly. *See* Ex. 3 at 01:37. Corporal Painter grabbed on to K-9 Scout's collar, removed the suspect's left hand from Scout's collar, and pulled Scout away from Plaintiff, while Officer Wilson crossed over them in the narrow hallway in order to detain the suspect in handcuffs. *See* Ex. 3 at 01:38-02:00.

Officer Wilson then handcuffed the suspect, and the suspect was assisted up from the ground by CCPD officers and removed from the apartment. *See* Ex. 3 at 01:58-02:26; Ex. 5 at 08:10-08:45, 10:09-11:00. No additional force was used after the K-9 seized the suspect and the suspect was placed in handcuffs. *Id.* CCPD officers immediately requested medical assistance and treatment for the suspect's arm. *See* Ex. 1; Ex. 2 at 11:42-11:45. While detained in handcuffs,

the suspect was identified as Plaintiff.  *See* Ex. 8 at 09:10-09:20. Plaintiff received medical treatment on scene from Chesterfield County Fire and EMS.  *See* Ex. 7 at 00:21-04:36.  He ultimately needed stiches for the wound on his arm. *See* Ex. 7 at 01:30-01:36.  While Plaintiff was receiving medical attention, the responding CCPD officers cleared the apartment and completed their investigation to determine whether charges should be brought.  *See e.g.*, Ex. 6 at 08:40-49:05. As part of their investigation, CCPD officers confirmed with the leasing office that the complainant, as she represented to the police, was in fact the only person on the Lease for the apartment.  *See* Ex. 5, (Kara Kennedy is the complainant); Ex. 8 at 16:30-17:30.

Throughout the entire encounter, and despite police presence, five warnings by Corporal Painter, numerous other loud directives to Scout to "find him," and the presence of the dog himself, Plaintiff never identified his location, never announced his intent to surrender, and never physically showed an intent to surrender until the very second K-9 Scout located him.

Through questioning Plaintiff after he was detained, CCPD officers determined that the complainant was apparently an ex-girlfriend of Plaintiff's uncle, the uncle had kept a key to Plaintiff's apartment and the uncle had given Plaintiff the key and told him he could stay in the apartment while the complainant was in Virginia Beach.  *See* Ex. 5 at 12:48-13:16; Ex. 7 at 01:37-02:03; Ex. 8 at 03:55-12:10.

While Plaintiff was sitting on the edge of the back of the ambulance, CCPD Sergeant Hlava explained to Plaintiff that the officers had responded to a 911 call, what information was known to the officers when they arrived on the scene and why, based on that information, there was probable cause for their entry into the complainant's apartment and the deployment of K-9 Scout.  *See* Ex. 7 at 00:40-02:02.  Plaintiff responded by stating he understood, he told the officer "I'm sorry," and he shook the officer's hand.  *See* Ex. 7 at 02:02-02:07.  After consultation with the

6

Commonwealth's Attorney's Office, Plaintiff was ultimately released from detention and no charges were brought against him or the complainant.  *See* Ex. 7 at 02:23-02:37.

The facts set forth above are established with unquestionable clarity from the BWC videos of Corporal Painter, Sgt. Hlava, and Officers Claud, Wilson, and Cash.  In addition, the facts established by these BWC videos, the CAD Report, and the Apartment Lease directly contradict many of Plaintiff's allegations in the Complaint, including, but not limited to, the following:

    a.    "Mr. Williams was in at a residence where he was lawfully residing with permission;"

    b.    "This apartment was leased under the name of his friend, Tyleek Harris;"

    c.    "Defendant Painter entered Mr. Williams' residence with his K-9 without a warrant or probable cause;"

    d.    "Following Defendant Painter, Officer Wilson entered the property and encountered Mr. Williams who was coming out of the bedroom to see who was in his apartment;"

    e.    "Defendant Painter, without any threat of violence, risk of bodily harm or knowledge of who was present in the apartment, released his K-9 without justifiable cause;"

    f.    "The K-9 charged at Mr. Williams' left upper arm and bit Mr. Williams several times;"

    g.    "As the K-9 continued to bite Mr. Williams' arm, law enforcement proceeded to cuff him while trying to get the K-9 to release its grip;"

    h.    "The K-9 wouldn't release, so Defendant Painter had to punch the dog in the nose to get him to release his bite;"

    i.    "The K-9 would not listen to Defendant Painter's commands;"

    j.    "Mr. Williams never posed a threat of safety to the officers or others;" and

    k.    "Mr. Williams never resisted the officers."

(*See generally* ECF No. 1).

ARGUMENT

I.    <u>Standard of Review</u>

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.    In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).    This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."    *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A plaintiff must allege facts sufficient to raise a right to relief above a speculative level and state a claim that is "plausible on its face," rather than merely "conceivable."    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).    "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."    *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp.*, 550 U.S. at 556).    Therefore, for a claim or complaint to survive a dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim."    *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickinson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002)).

A court may also "consider documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Yousif v. Hailey*, No. 1:23-CV-81, 2023 WL 7413328, at *1 (E.D. Va. Nov. 9, 2023); *Lawhon v. Edwards*, No. 3:19-CV-924, 2020 WL 4589195, at *4 (E.D. Va. Aug 10, 2020).    "[I]n

the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit prevails." *Lawhon*, 2020 WL 4589195, at *4 (citing *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

When a video is submitted at the motion to dismiss stage of a case, a court may consider such video "when (1) [it] is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679-80 (2024) (citing *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024)).

There are eight records attached to Corporal Painter's Motion to Dismiss—the CAD Report, the Apartment Lease, and six BWC videos—all of which are integral to the alleged violations set out in Complaint and contradict many of Plaintiff's allegations in the Complaint. The CAD Report describes the very basis for the law enforcement encounter that gave rise to the Complaint and provides the Court with the information known to the responding CCPD officers, including Corporal Painter, before entry into the apartment and the deployment of K-9 Scout.  The Apartment Lease establishes that the complainant was the only tenant on the Lease, which is consistent with the complainant's representations to 911 and the CCPD officers and the Lease directly contradicts Plaintiff's allegation that the Lease was under the name of his fried, Tyleek Harris.  Further, both the CAD Report and the Apartment Lease contain factual information integral to the question of whether there was probable cause for Corporal Painter's actions.  These operative records therefore can and should be considered by the Court at this stage of the proceedings.

The attached BWC videos depict a set of facts that are clearly contrary to the facts alleged in Plaintiff's Complaint.  As a result, the Court can and should also consider these videos at the motion to dismiss stage and in ruling on Corporal Painter's entitlement to qualified immunity.  *See Goines*, 822 F.3d at 167-69; *Doreity*, 109 F.4th at 679-80.

Where there is conflict between the bare allegations of the Complaint and the attached records and BWC videos, the facts shown in the records and videos shall prevail.  *See Goines*, 822 F.3d at 166; *Fayetteville Inv'rs* 936 F.2d at 1465.

II.    <u>Corporal Painter's Actions Were Objectively Reasonable and Did Not Violate Clearly Established Law.</u>

Plaintiff's Complaint attempts to assert a claim against Corporal Painter, pursuant to 42 U.S.C. § 1983, for excessive use of force in violation of the Fourth Amendment (Count I), and under Virginia law for common law assault (Count II) and battery (Count III).  The admissions in the Complaint combined with the facts established by the CAD Report, Apartment Lease, and the BWC videos, however, demonstrate that Corporal Painter's use of K-9 Scout to seize an intruder who had reportedly broken into the complainant's home, was still hiding in the apartment, and did not comply with numerous police warnings and commands that the K-9 would be released to bite was objectively reasonable under the law.  In addition, there was no clearly established law that would have put Corporal Painter on notice that deploying a K-9 during a burglary in progress, in an apartment with limited entrances and exits, on a suspect who was not lawfully present in the apartment and ignored at least five warnings would violate the suspect's Fourth Amendment rights. *See Putman v. Harris*, 66 F.4th 181, 186-87 (4th Cir. 2023); *Maney v. Garrison*, 681 F. App'x 210, 216-23 (4th Cir. 2017); *Melgar ex. rel. Melgar v. Greene*, 593 F.3d 348, 355 (4th Cir. 2010); *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988); *Barker v. Gaylor*, No. 2:20-CV-00357, 2021 WL 3354161, at *4-5 (S.D.W. Va. Aug. 2, 2021).

10

A.  Corporal Painter is entitled to qualified immunity based on the facts presented and actions shown through the attached records and BWC videos and those stated in the Complaint.

Government officials are entitled to qualified immunity in a 42 U.S.C. § 1983 proceeding when their actions "do[ ] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The standard is one of objective reasonableness: "whether a reasonable officer could have believed [the conduct at issue] to be lawful, in light of clearly established law and the information the . . . officers possessed." *Anderson v. Creighton*, 482 U.S. 635, 641 (1987).  This is purely a question of law. *Putnam v. Harris*, 66 F.4th 181, 186 (4th Cir. 2023).

There is a two-step procedure for determining whether the defense of qualified immunity applies to a claim of a constitutional violation under § 1983.[2] *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  First, a trial court determines whether, "[t]aken in the light most favorable to the party asserting the injury," the facts alleged by that party "show the officer's conduct violated a constitutional right." *Id.* at 201.  Second, the court must explore "whether the right was clearly established." *Id.* at 202.  In determining whether a right is clearly established, courts consider whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted in light of pre-existing law. *Id.*

"[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).  "Qualified immunity thus provides a safe-harbor from tort damages for police officers performing objectively reasonable actions in furtherance of their duties." *Id.*  Whether an officer's actions are "objectively

---

[2] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

reasonable" is a question of law, "without regard to their underlying intent or motivation." *Putman*, 66 F.4th at 187 (citing *Graham*, 490 U.S. at 397).

Qualified immunity is typically an immunity from suit, rather than a mere defense to liability, and is effectively lost if a case is erroneously permitted to proceed through the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (stating that qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal [immunity] question"). The United States Supreme Court has "made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" *Pearson*, 555 U.S. at 223; *see also Am. Civil Liberties Union v. Wicomico Cnty., Md.*, 999 F.2d 780, 784 (4th Cir. 1993) (stating that "in order to weed out insubstantial § 1983 claims without resort to a trial or extensive pre-trial proceedings, a trial court confronted with an assertion of qualified immunity should first determine whether the plaintiff has properly asserted a constitutional violation").

This case demonstrates the necessity of evaluating a claim of qualified immunity at the earliest possible stage—motion to dismiss. *Pearson*, 555 U.S. at 232 ("we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation"). While historically it may have been unusual for a police officer to establish an entitlement to qualified immunity at the motion to dismiss stage, the availability, in particular, of BWC video has allowed law enforcement officers to show the Court early on in the litigation what the actual facts and circumstances are surrounding the incident that give rise to the causes of action in the Complaint. *See e.g.*, *Harrold v. Hagen*, No. 3:23CV866 (MHL), 2024 WL 4336745 (E.D. Va. Sept. 27, 2024) (granting motion to dismiss in favor of officer on federal claims); *Scott v. Ross, et al.*, No.

3:24CV196 (DJN) (E.D. Va. April 19, 2024) (granting motion to dismiss in favor of officers on federal and state claims).  The case at hand is uniquely positioned because of the comprehensiveness of the audio and video captured by the CCPD officers' BWC videos which directly contradict the allegations in the Plaintiff's Complaint.  The facts shown in the BWC video, as well as in the attached CAD Report and Apartment Lease demonstrate that, as a matter of law, Corporal Painter's actions were objectively reasonable and there was no violation of any clearly established constitutional right.

>    B.    <u>Corporal Painter's use of force in deploying his K-9 after giving the suspect numerous warnings was objectively reasonable.</u>

The threshold inquiry pertinent to Counts I, II, and III of the Complaint is whether Corporal Painter violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures.  Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Corporal Painter's use of force of deploying K-9 Scout on a burglary suspect, after issuing numerous warnings prior to K-9 Scout's release, was objectively reasonable under the circumstances, and therefore did not constitute a violation of Plaintiff's constitutional rights under the Fourth Amendment or an assault or battery. *See Putman*, 66 F.4th at 187 (since the "immediate safety risk [was] reasonably likely to be cured by using the dog, Harris's deployment was justified"); *Maney*, 681 F. App'x at 216; *Melgar ex rel. Melgar*, 593 F.3d 348 (granting officer qualified immunity for K-9's bite); *Jones v. Wild*, 244 F. App'x 532, 533 (4th Cir. 2007); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 175 (4th Cir. 1998) (reinforcing that a police officer needs "to give a verbal warning before deploying a police dog to seize someone")*; Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991) (recognizing the importance of giving a warning "that the dog is going to attack").

Virginia common law claims that arise from an officer's use of force, such as assault and battery, as claimed here in Counts II and III, respectively, are "subsumed within the federal excessive force claim." *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). "As a result, state-law tort claims will usually fail or proceed with the federal excessive force violation if the standards of qualified immunity are met or not met respectively." *Bromwell v. Pankoke*, No. 4:17CV60, 2018 WL 3580767, at *7 (E.D. Va. July 25, 2018).

"It is well-established that *all* claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its reasonableness standard, including claims that police canines were improperly deployed." *Melgar*, 593 F.3d at 355 (internal quotation marks and citations omitted); *Vathekan,* 154 F.3d at 178. "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Barker*, 2021 WL 3354161, at *4-5. "Reasonableness is evaluated from the officer's perspective in recognition of the fact that officers cannot be expected to respond to information they did not possess at the time they acted . . . ." *Melgar*, 593 F.3d at 355 (internal citations omitted).

"A reviewing court may not employ the 20/20 vision of hindsight." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396-97). "The court's focus should be . . . on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Id.* "[T]hreats to officer safety are not imaginary . . . ." *Maney*, 681 F. App'x at 222. The reality is that "police are often asked to intervene at a moment's notice in tense, difficult, situations, on the basis of imperfect information and with little time for deliberation. That is why we do not engage in unrealistic second-guessing of action taken in swiftly developing situations, and why we

14

do not subject officers to personal liability for bad guesses in gray areas." *Id.* (internal citations and quotation marks omitted).

In determining the objective reasonableness of an officer's use of force, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight."[3] *Graham*, 490 U.S. at 396. The Fourth Circuit has also instructed that the extent of the plaintiff's injuries is a relevant consideration. *See Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003); *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). Corporal Painter addresses each *Graham* factor in turn.

1.    The severity of the crimes at issue.

Plaintiff alleges that Corporal Painter lacked probable cause to enter the complainant's apartment with K-9 Scout (*See* ECF No. 1 at ¶ 15)[4], however, the BWC videos and CAD Report clearly contradict this allegation and demonstrate that Corporal Painter, and his fellow CCPD Sergeant and officers, had probable cause that Plaintiff had committed a breaking and entering and

---

[3] Although Plaintiff makes reference throughout the Complaint to previous lawsuits brought against Corporal Painter in support of his claim of excessive force in this case (*see* ECF No.1 at ¶¶ 51, 59, 69), the mere fact that an officer has had two lawsuits filed against him does not mean that the officer's use of force at issue in the case at hand is unreasonable, nor is it a factor the Court may consider when determining whether an officer's use of force was objectively reasonable.

[4] "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks omitted). "An officer has probable cause to arrest a suspect when the totality of the circumstances indicate to a reasonable person that a suspect has committed, is committing, or is about to commit a crime . . . ." *Jack v. Chapman*, No. 3:16CV316, 2018 WL 1785480, at *7 (E.D. Va. Apr. 13, 2018) (internal citations and quotation marks omitted).

was likely in the progress of committing a burglary at the time K-9 Scout was deployed and officers entered the apartment.  Specifically, at the time of entry, Corporal Painter knew that the complainant broke open her apartment door and found a tall black man, whom she did not know, naked in her bed, wrapped up in one of her blankets.  (ECF No. 1 at ¶ 14.)  *See* Ex. 1; Ex. 2 at 01:50-01:55; Ex. 4 at 00:52-01:40.  Corporal Painter knew the complainant called 911 to report the crime, that she had informed officers she was the only person on the Lease for the apartment, and that she had not given permission to or had any knowledge of any other persons being in the apartment or allowed in the apartment.[5]  *See* Ex. 1; Ex. 2 at 01:56-01:58; Ex. 4 at 00:04-00:06; Ex. 7 at 00:53-01:05.  Corporal Painter also knew at the time of entry that the man was reportedly still inside the apartment.  *See* Ex. 2 at 04:30-04:35 (officer heard over radio saying "the individual is still in her bed"); Ex. 4 at 00:15-00:20.  Corporal Painter and his fellow CCPD officers were entitled to rely on this information provided to them by the complainant to establish the basis for their entry into the apartment and for their use of force.  *See Navarette v. California*, 572 U.S. 393, 400 (2014); *United States v. Kehoe*, 893 F.3d 232, 239 (4th Cir. 2018) (stating the officers were entitled to rely on the information provided by the 911 caller).  Therefore, based on the facts known by Corporal Painter and the other CCPD officers at the time of entry, an objectively reasonable officer would conclude that a breaking and entering, or a burglary, was in progress and that at least one suspect remained in the complainant's apartment.  There was probable cause for Corporal Painter to deploy his police K-9 to seize the intruder.  *See Pringle*, 540 U.S. at 371.

Notably, burglary has been recognized both by courts and the law as a violent crime.  The Supreme Court has stated that "[b]urglary is dangerous because it can end in confrontation leading

---

[5] The complainant, Kara Kennedy, is the only person on the Apartment Lease.  *See* Ex. 5  The Lease agreement directly contradicts Plaintiff's allegation that the Lease for the apartment was in the name of "his friend, Tyleek Harris." (ECF No. 1 at ¶ 10.)

to violence." *Sykes v. United States*, 564 U.S. 1, 9 (2011), *overruled on other grounds by Johnson v. United States*, 135 S. Ct. 2551 (2015). In addition, federal law classifies burglary as a violent felony. 18 U.S.C. § 924(e)(2)(B); *see Harrold*, No. 3:23CV866, 2024 WL 4336745, at *9. Thus, the severity of the crimes which were reported by the complainant to police in this case are considered high.

Moreover, rather than making his presence known when CCPD officers and Corporal Painter opened the front door to the apartment, announced their presence, and warned that the police K-9 would bite, Plaintiff ignored numerous commands to "speak to [Corporal Painter] now" and ignored warnings that Corporal Painter had and would use the K-9 to bite. *See* Ex. 3 at 00:50-01:26. As such, an objectively reasonable officer would not only suspect Plaintiff of burglary but would also suspect he was obstructing justice and would consider that Plaintiff was looking for an alternative way out of the apartment or preparing to ambush the officers. [6] Va. Code Ann. § 18.2-460. Thus, the first factor—severity of the suspected crimes—weighs heavily in favor of Corporal Painter.

2.    Whether the suspect poses an immediate threat to the safety of the officers or others.

Plaintiff's allegation that he "never posed a threat of safety [to] the officers or others" (*see* ECF No. 1 at ¶ 29) is not made from the perspective of an objectively reasonable officer who was responding to the scene of a dispatched breaking and entering and burglary in progress at an

---

[6] Plaintiff's passive resistance of ignoring multiple law enforcement commands, as clearly depicted on the BWC video, directly contradicts Plaintiff's allegation that he "never resisted the officers." (*See* ECF No. 1 at ¶ 30.) *See also* Ex. 3 at 00:50-01:26. It also directly contradicts Plaintiff's allegation that Corporal Painter "released his K-9 without justifiable cause." (*See* ECF No. 1 at ¶ 20.) Further, it is notable that the BWC video shows that Plaintiff ignored Corporal Painter's commands for almost 40 seconds before Plaintiff finally exited the bedroom. *See* Ex. 3 at 00:50-01:26. Officer Wilson commanded that Plaintiff put his hands up only after Plaintiff finally exited the bedroom—which was simultaneous with K-9 Scout's bite. This directly contradicts Plaintiff's allegations in Paragraphs 16 through 20 of the Complaint. (*See* ECF No. 1 at ¶¶ 16-20.)

apartment complex. *See* Ex. 1. The BWC video directly contradicts Plaintiff's allegation regarding the threat posed and it clearly demonstrates, given the totality of the circumstances surrounding this incident, that each of the officer on scene perceived the suspect to be an immediate threat to their safety and the safety of other people in the apartment complex. The threat to the safety of the officers and others was objectively reasonable and is supported in the first part by the fact that the complainant ran out of her apartment and called 911 to report a breaking and entering with the suspect still inside her home. *See* Ex. 1; Ex. 2 at 01:50-1:55; Ex. 4 at 00:52-01:40. In addition, the fact that CCPD officers were directed to set a perimeter and wait for the arrival of the requested K-9 and K-9 officer, Corporal Painter, demonstrates that both supervision and officers believed their safety would unnecessarily be at risk if they were to go in to the apartment and back bedroom without first deploying the K-9. *See* Ex. 2 at 02:00-02:10. Since the suspect was in the residence and there were therefore so many unknowns for the officers, an objectively reasonable officer would conclude the suspect had a distinct advantage—an ability to prepare, hide or ambush—and waiting for K-9 Scout to be deployed allowed the officers to make a safer entry into the apartment.

The immediate threat posed to the officers and others at the apartment complex is further apparent from the BWC video which shows the responding CCPD officers strategically positioning themselves along the perimeter of the apartment building and at the entrance and patio exit to the apartment in order to contain the suspect and prevent his flight. *See* Ex. 7 at 01:06-01:13; Ex. 8 at 01:28-03:55. Also supporting the objective reasonableness of the safety threat posed by the suspect at the time of the response is the fact that the officers positioned near the apartment's patio and near the front entrance to the apartment all had their service weapons or Tasers drawn, and Officer Wilson provided Corporal Painter with lethal cover. *Id.* The responding

CCPD officers took necessary precautions to protect themselves and other individuals at the apartment complex due to the immediate safety threat posed by the suspect, based on the facts known to them at the time.

Again, at the time of entry, Corporal Painter had been advised that a large man had unlawfully broken into complainant's apartment; the suspect was still in the apartment; it was unknown if the suspect had access to weapons or had used weapons to break into the apartment; it was unknown if the suspect was alone; and the suspect was not complying with Corporal Painter's several loud, verbal commands to show himself or the police K-9 would be released and bite. *See* Ex. 1; Ex. 2 at 01:50-1:55, 04:30-04:35; Ex. 3 at 00:50-01:26; Ex. 4 at 00:15-00:20, 00:52-01:40. The suspect's failure to adhere to Corporal Painter's numerous commands, despite having had time to comply, heightens an officer's concern as to the threat the suspect poses. Therefore, it was reasonable for Corporal Painter to "conclude that [ ] resistance present[ed] some immediate danger despite its non-violent character." *See Putman*, 66 F.4th at 188.

It was also objectively reasonable to conclude, given the potentially violent nature of a burglary in progress, that the suspect could have been armed. In fact, the Fourth Circuit Court of Appeals has recognized that the suspected crime of burglary is "a felony that often involves the use of weapons." *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989) (citing *United States v. Moore,* 817 F.2d 1105, 1108 (4th Cir. 1987)). There was no way for Corporal Painter or the other CCPD officers to confirm whether the suspect was armed or unarmed until (1) the suspect was within arms' reach of the CCPD officers so they could perform a pat down or (2) the suspect followed commands to show himself and put his hands up, commands which the suspect admittedly heard but did not follow until after the K-9 had been deployed and was biting the suspect. *See* Ex. 6 at 09:50-10:00; *see Putman*, 66 F.4th at 187.

The objective reasonableness of the safety threat perceived by Corporal Painter and the other CCPD officers is also supported by the fact that after the suspect was placed in handcuffs, CCPD officers continued to clear the remaining areas and rooms within the apartment with their weapons drawn to ensure there were no other suspects hiding in the apartment.  *See* Ex. 6 at 8:30-10:15.  Therefore, the second *Graham* factor—immediacy of the threat to the safety of officers or others—weighs in Corporal Painter's favor.

3.    Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

After the complainant knocked in the front door to her apartment, which had been locked from the inside, and found the suspect in her bed, she told him she was going to call the police. (ECF No. 1 at ¶¶ 13-14.)  Plaintiff made the decision to remain in the apartment for a number of minutes before Corporal Painter arrived on scene, opened the apartment door, and announced himself and the presence of his K-9.  *See* Ex. 2 at 04:30-04:35; Ex. 4 at 00:15-00:20.  After Corporal Painter announced himself at the doorway, the suspect continued to remain in the bedroom at the end of a dark hallway, not visible to the officers, while Corporal Painter gave several commands and warnings, all of which Plaintiff heard but did not comply with.  *See* Ex. 3 at 00:50-01:26.  Given Corporal Painter's reasonable belief that the suspect had broken into the home, there was a burglary in progress, that the suspect may have been armed, and that the suspect had remained in the apartment without displaying any intention of surrendering despite law enforcement presence and several commands and warnings, an objectively reasonable officer would construe Plaintiff's actions as an attempt to resist or evade arrest.  The third and final *Graham* factor therefore weighs in Corporal Painter's favor.

4.      The extent of Plaintiff's injuries.

As a result of K-9 Scout's deployment, Plaintiff suffered a bite in his upper left arm, which ultimately required stiches.  *See* Ex. 7 at 01:30-01:36.  While the extent of a plaintiff's injuries can be considered in determining whether an officer's use of force was excessive, such factor does not weigh in Plaintiff's favor in this case, as Plaintiff was a suspect in a serious crime and the injury inflicted was not severe.  *See e.g., Jones*, 325 F.3d at 527, 530-31 (finding that the "severe" injuries suffered by the plaintiff—"a nose crushed into numerous pieces, lacerations of the nose and lips, each requiring multiple sutures, and bruised ribs" weigh in the plaintiff's favor when determining whether the officer's use of force was excessive); *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (finding that the plaintiff's injuries—three cracked teeth, cuts to her nose, and bruising to her face—weigh in plaintiff's favor); *Rowland*, 41 F.3d at 174 (the court considered the fact that the plaintiff "suffered a serious leg injury over a lost five dollar bill").  Further, when the CCPD Sergeant spoke with Plaintiff while he was receiving medical assistance, Plaintiff appeared in good spirits and not in distress, suggesting that the injuries he sustained were not serious.  *See* Ex. 7 at 00:40-02:37.  Therefore, the final factor in determining whether Corporal Painter's actions were objectively reasonable weighs in his favor.

Based on the totality of the circumstances, construed in the light most favorable to Plaintiff, Corporal Painter's decision to deploy K-9 Scout to seize Plaintiff, a burglary suspect, after giving at least five loud and clear commands and verbal warnings was objectively reasonable and did not violate Plaintiff's clearly established Fourth Amendment rights.  *Graham*, 490 U.S. at 396. Moreover, on the facts known by Corporal Painter at the time of the seizure, Corporal Painter's decision to deploy his K-9 certainly was not plainly incompetent." *Putman*, 66 F.4th at 188 (citing

*Ashcroft*, 563 U.S. at 743).  Therefore, Corporal Painter is entitled to qualified immunity and the Court should dismiss the Complaint with prejudice in its entirety.

C.    There is no binding precedent holding that use of a police K-9 in sufficiently similar circumstances constituted an unreasonable use of force.

For a right to be clearly established, it must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority.  *Ashcroft*, 563 U.S. at 741-42; *Wilson v. Layne*, 526 U.S. 603, 617 (1999).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he was doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal citations and quotation marks omitted) (quoting *Reichle v. Howards*, 566 U.S. 658, 663 (2012)).

The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality."  *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).  Explaining that "[s]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . ."  *Id.; see also Barker*, 2021 WL 3354161, at *7; *Benton v. Layton*, No. 3:22-CV-225, 2023 WL 3727934, at *10 (E.D. Va. May 30, 2023).

At the time of the events in question, October 11, 2022, the state of the law simply did not provide Corporal Painter with "fair warning" that his conduct in this case would violate a constitutional rule.  In fact, most of the Fourth Circuit cases involving police canines that existed prior to October 22, 2022 focused primarily on the importance of law enforcement providing a

verbal warning before releasing the K-9 or allowing it to bite an individual.  Here, Corporal Painter issued not one, but five warnings prior to using Scout to aid him in seizing Plaintiff.  *See e.g., Maney*, 681 F. App'x at 216, 223; *Melgar*, 593 F.3d at 178-79; *Kopf*, 942 F.2d at 266-68.

There is not a single case with controlling authority that puts police canine officers on notice that it would be a violation of a burglary suspect's Fourth Amendment rights to be caught in the act and seized, at the precise moment he's finally coming out of his hiding place, by a police K-9 after officers had already given multiple loud and clear warnings regarding the presence of the K-9.  Nor are there any controlling cases holding that an officer must immediately release a K-9 from his bite before placing a suspect in handcuffs, as Plaintiff seems to contend.[7]  To the contrary, in *Putman*, the Fourth Circuit held that a K-9 bite that lasted 30 seconds, did not constitute excessive force.  *Putman*, 66 F.4th at 185.  And, in *Maney*, the Fourth Circuit held that an officer may even briefly prolong a K-9's bite on an individual even after the officer has determined that the individual is not the suspect they are searching for.  *Maney*, 681 F. App'x at 218.  Because there is no controlling case out of the Supreme Court or Fourth Circuit Court of Appeals that squarely governs the facts at hand, Corporal Painter is entitled to qualified immunity at this stage of the case.

<u>CONCLUSION</u>

For the reasons stated herein, and in the Motion to Dismiss, Corporal Painter respectfully requests that his Motion to Dismiss be granted and that the Complaint be dismissed with prejudice.

---

[7] While Plaintiff alleges that Scout "continued to bite [Plaintiff's] arm [while] law enforcement proceeded to cuff him," the BWC video clearly shows that Corporal Painter grabbed Scout by the collar and pulled him away from Plaintiff approximately 15 seconds after Scout made contact with him in order for Officer Wilson to then be able to step in and place handcuffs on Plaintiff.

GORDON J. PAINTER

By:    /s/ Katherine C. Gill
        Julie A. C. Seyfarth (VSB #46207)
        Senior Deputy County Attorney
        Katherine C. Gill (VSB #87409)
        Senior Assistant County Attorney
        Chesterfield County, Virginia
        P. O. Box 40
        Chesterfield, Virginia 23832
        Telephone: (804) 748-1491
        Facsimile: (804) 706-2615
        seyfarthj@chesterfield.gov
        gillk@chesterfield.gov