IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DERRICK WILLIAMS,

     Plaintiff,

v.                            Civil Action No. 3:24-cv-696

GORDON J. PAINTER,

     Defendant.

### MEMORANDUM OPINION

This matter is before the Court on the MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (ECF No. 33) ("MOTION"), the MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (ECF No. 34) ("Painter Mem."), the PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFEDNANT'S [sic] MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT (ECF No. 36) ("Resp."), and the REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (ECF No. 37) ("Reply"). Having reviewed those papers and for the reasons set forth below, the MOTION will be GRANTED as to COUNT I which will be dismissed for failure to state a claim upon which relief can be granted because the Defendant, Gordon J. Painter, is entitled to qualified immunity. The Court declines to exercise jurisdiction over the state law claims in COUNTS II and III and they will be dismissed without prejudice.

### PROCEDURAL BACKGROUND

On October 2, 2024, Derrick Williams ("Plaintiff" or "Williams") filed the COMPLAINT (ECF No. 1) against Gordon J. Painter ("Defendant" or "Corporal Painter") for injuries that he allegedly sustained because Corporal Painter, a K-9 Officer with the Chesterfield County Police Department ("CCPD"), improperly deployed his K-9 unit.

On December 1, 2024, Williams filed the FIRST AMENDED COMPLAINT (ECF No. 14). Shortly thereafter, on December 4, 2024, Corporal Painter filed the MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF NO. 16). On January 24, 2025, the Court held an initial pre-trial conference in this matter, and found that it was necessary both for Williams to file a Second Amended Complaint and for the parties to address whether Body-Worn Camera ("BWC") footage of responding officers in this case could be considered when analyzing a motion to dismiss under the Fourth Circuit's recent decision Doriety v. Sletten, 109 F.4th 670 (4th Cir. 2024). On January 30, 2025, the Court entered a MEMORANDUM OPINION (ECF No. 29), and a corresponding ORDER (ECF No. 30), which denied the MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF NO. 16) without prejudice to the refiling of that motion.

On February 17, 2025, Williams filed the SECOND AMENDED COMPLAINT (ECF No. 32) ("SAC"). The SAC asserts three counts. COUNT I alleges a violation of Fourth Amendment rights by virtue of

excessive force in the form of an unauthorized attack by a police dog. COUNT I is brought through 42 U.S.C. § 1983 which authorizes suit in federal court for the violation of a federal, constitutional, or statutory right. COUNTS II and III are state law claims. COUNT II alleges assault and COUNT III alleges battery, and both COUNTS arise out of the same factual pattern that forms the basis for the allegations of COUNT I.

## FACTUAL BACKGROUND

### A. Doriety: Introduction of Body-Worn Camera Footage

#### i. Legal Standard

To resolve the MOTION, it is necessary first to decide whether the BWC footage of Corporal Painter and Officer Wilson, a fellow CCPD officer who responded to the scene, may be considered in assessing the merits of a Rule 12(b)(6) motion. In Doriety v. Sletten, the Fourth Circuit recently held that a district court may consider a video recording submitted at the motion to dismiss stage, without converting the motion to one for summary judgment, "when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." 109 F.4th at 679-80 (quoting Saalim v. Walmart, Inc., 97 F.4th

3

995, 1002 (6th Cir. 2024)). "As the phrase 'blatantly contradicts' implies, '[t]his standard is a very difficult one to satisfy' and requires that the plaintiff's version of events be 'utterly discredited' by the video recording." Id. at 679 (additional internal quotation marks omitted) (quoting Lewis v. Caraballo, 98 F.4th 521, 529 (4th Cir. 2024)).

### ii. Integral Nature of the BWC Videos

The first step of the Doriety test requires a determination of whether Corporal Painter's and Officer Wilson's BWC videos are "integral" to the SAC. Doriety, 109 F.4th at 679-80. The SAC does not cite to any BWC footage; however, Corporal Painter argues that the BWC videos of Corporal Painter and Officer Wilson are nonetheless integral to the SAC because specific allegations in the SAC could have only been known to Williams through a review of those BWC videos. Painter Mem. at 2-3. Specifically, Corporal Painter points out that the allegations in ¶¶ 20, 24, 25, and 30 of the SAC were not pled in Williams' initial Complaint (ECF No. 1), but were only pled after Williams received the BWC videos as an attachment to Corporal Painter's initial Motion to Dismiss (ECF No. 13). Id. (citing SAC ¶¶ 20, 24, 25, and 30).

A review of the SAC reveals that the BWC footage is the basis of significant allegations in the SAC. First, and importantly to the Williams claim, the SAC alleges that Painter was in a "kneeling position" and was "behind the threshold of a door" in the hallway

4

outside of the apartment when he "called out a muffled statement about having a K-9." SAC ¶¶ 24-25. Williams could not have been aware of Corporal Painter's position or his statement about having a K-9 without the BWC footage because the SAC simultaneously alleges that Williams was inside of a closed-off bedroom at that moment in time and alleges that, therefore, all statements made by Painter were "inaudible." SAC ¶¶ 30, 78. Second, the SAC alleges that "[f]rom the time that Defendant Painter released the K-9 and gave his inaudible commands to the time Mr. Williams was attacked was 26 seconds." SAC ¶ 30. Without the use of the BWC footage, Williams could not have pled that timeframe with such precision because the SAC alleges that Corporal Painter's commands were "inaudible" and, thus, there would be no moment for Williams to have started his supposed internal stopwatch. SAC ¶ 30. The allegations of the SAC are inherently at odds with each other unless the SAC is relying upon the BWC footage in addition to Williams' personal knowledge. For those two reasons, the Court finds that the SAC relies upon the BWC footage in pleading facts of which Williams could not have otherwise been aware. See, e.g., Bell v. City of Southfield, Michigan, 37 F.4th 362, 364 (6th Cir. 2022) ("plaintiff's complaint implicitly relies on the videos by recounting facts that could only be known to him by watching the videos. Thus, it makes little sense to waste time and effort by ignoring the videos' contents.") And, because the allegations of

the SAC both implicitly and heavily rely upon the BWC footage to state the constitutional claim (COUNT I) under § 1983, the BWC footage will be treated as integral to the SAC. See Goines v. Valley Cmty. Serv. Bd., 822 F.3d 159, 166 (2016) (relying upon the Second Circuit's explanation that "a document is 'integral to the complaint' 'where the complaint relies heavily upon its terms and effect'") (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)). As the Sixth Circuit held in Saalim v. Walmart, Inc., 97 F.4th 995, 1002 (6th Cir. 2024):

> Where a complaint even 'implicitly relies on [a] video [ ]' it can make sense to consider it even at an early stage of litigation. This is particularly true when determining whether qualified immunity applies, as qualified immunity is a complete defense to not just liability, but to litigating the suit itself, making early resolution central to the protection it offers.

(internal citation omitted).

Williams objects that the BWC footage is not integral because the "audibility of [Painter's] commands" and the fact that "26 seconds" elapsed from the moment Corporal Painter began shouting commands until he was bitten by the dog are "well plead and are corroborated by the Plaintiff's own memory." Resp. at 11. That is, in essence, a failure to respond to Painter's arguments. As discussed above, the SAC alleges the exact time frame, down to the second, in which Corporal Painter made his initial command until the moment that Williams was bitten by the K-9. SAC ¶ 30. The SAC also alleges, in that same paragraph, that Williams was inside of

6

the bedroom and could not see Painter or hear commands that he gave. See SAC ¶ 30; see also SAC ¶ 25 ("there was no someone in a bed that was not even visible in the room for which he opened the door would be able to hear his muffled call from behind a door threshold in a hallway."). Because those allegations could not have been pled together without the use of the BWC footage, and because Williams' fails to address the merits of this issue, the Court finds that the BWC videos of Corporal Painter and Officer Wilson are integral to the SAC.

### iii. Blatant Contradictions Between the SAC and the BWC Footage

Nonetheless, under Doriety, the BWC footage may be considered but only insofar as it "blatantly contradicts" the allegations made in the SAC. Doriety, 109 F.4th at 679-80. A comparison between the BWC footage of Corporal Painter (Painter Mem., Ex. 1) and Officer Wilson (Painter Mem., Ex. 2) and the SAC reveals the following contradictions:

1) The SAC alleges that "Defendant Painter did not give clear verbal commands" and that "Defendant Painter never knocked, never announced that they were the Chesterfield County Police conducting an investigation." SAC ¶ 22-23. That is blatantly contradicted by Corporal Painter's BWC footage in which he loudly made the following five announcements into the apartment: (1) "police K-9, speak to me now or

7

I'll release the dog, if the dog finds you, you'll be bit" (Painter Mem., Ex. 1 at 00:52-57); (2) "police K-9, speak to me now" (Id. at 01:00-01:02); (3) "anybody home?" (Id. at 01:02-01:04); (4) "now's your chance, speak up" (Id. at 01:06-01:08); and (5) "come out now." (Id. at 01:18-01:19).

2) The SAC alleges that "this was not a serious situation and no lesser means of force were ever attempted of any sort, not even calling out for the suspect, announcing that they were the police, knocking or conducting a search." SAC ¶ 63. The BWC footage blatantly contradicts that allegation because Corporal Painter twice announced into the apartment that he was with police, (Painter Mem., Ex. 1 at 00:52-57; 01:00-01:02), called out three times asking for anyone in the apartment to "speak" to him so as to de-escalate the situation, (Id. at 00:52-57; 01:00-01:02; 01:06-01:08), and made five announcements to Williams altogether before any use of force was made by the K-9, (Id. at 00:52-57; 01:00-01:02; 01:02-01:04; 01:06-01:08; 01:18-01:19).

3) The SAC alleges that "Defendant Painter . . . called out a muffled statement about having a K-9." SAC ¶ 24. The SAC repeats the allegations that Corporal Painter only made a "muffled call" that Williams could not have heard in the bedroom. SAC ¶ 25. That is outright contradicted by the volume in which Corporal Painter makes these announcements

8

in the BWC footage. See Painter Mem., Ex. 1 at 00:52-57; 01:00-01:02 (Corporal Painter announced loudly "police K-9" two different times before releasing his K-9 into the apartment.); Ex. 2 at 06:55 – 07:15 ("police K-9").

4) The SAC alleges that "Defendant Painter . . . gave [] inaudible commands" and that "[t]here was no way someone in a bed that was not even visible in the room for which he opened the door would be able to hear his muffled call out from behind a door threshold in a hallway." SAC at ¶ 25, 26, 30, 78. Once again, the allegation that Corporal Painter gave an "inaudible" statement is contradicted by the volume of the five announcements on the BWC videos. Painter Mem., Ex. 1 at 00:52-57; 01:00-01:02; 01:02-01:04; 01:06-01:08; 01:18-01:19. Further, the BWC footage contradicts the SAC's allegations that Williams did not hear any of these announcements because in Officer Wilson's BWC footage he acknowledges that he heard the commands and that he "kept yelling I'm back here." Ex. 2 at 06:55-07:43, 09:50-09:58; compare SAC ¶ 26 ("Mr. Williams could not hear what was being said.").

5) The SAC alleges that "Defendant Painter immediately deployed his canine [after giving his] inaudible command [and] never allowed any time to surrender." SAC ¶ 78. As explained above, that is contradicted by the BWC footage.

The BWC footage compounds that contradiction by showing the lapse of time from the first command until Willliams came out of the bedroom, and the pauses that Corporal Painter took between each announcement to afford Williams a chance to respond. See Painter Mem., Ex. 1 at 00:54-01:20 (Corporal Painter gave four loud verbal commands and warnings to Williams, recalled the K-9 and gave one more warning to comply, however Williams did not immediately comply until the K-9 was already in position to seize him); see also Ex. 2 at 06:55-07:43.

6) The SAC alleges that "[t]here was never any non-compliance by Mr. Williams," that "Mr. Williams never resisted the officer," and that "Plaintiff NEVER resisted nor attempted to evade arrest by flight." SAC ¶¶ 42, 55, 68. It is correct that the BWC footage does not contradict the allegation that Williams never physically resisted Corporal Painter, but it does blatantly contradict the allegation that Williams initially complied with the verbal requests of Corporal Painter for anyone in the apartment to "speak" and identify themselves. Painter Mem., Ex. 1 at 00:52-57; 01:00-01:02; 01:06-01:08. Williams did not exit the room or make any response to Corporal Painter's five announcements until the dog was already unleashed and moving towards the bedroom. See Ex. 1 at 00:54-01:20

10

Therefore, the BWC footage contradicts the allegation that Williams fully complied with Corporal Painter before the use of the allegedly excessive force.

7) The SAC alleges that, after biting Williams, the "K-9 wouldn't release, so Defendant Painter had to punch the dog in the nose to get him to release his bite." SAC ¶ 35. A review of the BWC footage does not sufficiently contradict the allegation that the dog would not initially release Williams from its bite; however, the BWC footage shows that Corporal Painter did not punch the dog in the nose to get it to release its bite. Instead, the BWC footage clearly shows the Corporal Painter grabbed the dog firmly by its two collars while it was biting Williams, then twisted the metal pronged collar and pulled the dog away so that it would release its bite. See Painter Mem., Ex. 1 at 01:30-02:00.

8) The SAC alleges that, "[a]s the K-9 continued to bite Mr. Williams' arm; law enforcement proceeded to hand cuff him while trying to get the K-9 to release its grip." SAC ¶ 34. That statement is blatantly contradicted by the BWC footage because it shows that Corporal Painter had pulled the dog away from Williams before there was any attempt to handcuff him. Painter Mem., Ex. 2 at 07:50- 08:45.

Under Doriety, each of the foregoing facts from the video evidence constitutes a sufficiently blatant contradiction to warrant consideration in deciding the MOTION. 109 F.4th at 679-80.

Williams' response is the unexplained assertion that the BWC footage "is consistent with" the SAC and, in fact, corroborates it. Resp. at 11. Williams' one paragraph response is conclusory and does not address the detailed showing made by Corporal Painter as to the various contradictions presented by the BWC footage. Therefore, no showing has been made by Williams to prevent consideration of the eight foregoing pieces of video evidence in deciding the MOTION.

Corporal Painter submits that the Court should incorporate into its factual analysis additional contradictions presented by the BWC footage. Those contradictions will not be considered under the Doriety analysis for one of either two reasons.

First, a comparison between the BWC videos and the SAC does not sufficiently support a finding that particular contradictions urged by Corporal Painter overcome Doriety's high hurdle. See Doriety, 109 F.4th at 679 ("As the phrase 'blatantly contradicts' implies, '[t]his standard is a very difficult one to satisfy' and requires that the plaintiff's version of events be 'utterly discredited' by the video recording.") (internal citations omitted). Specifically, Corporal Painter asks the Court to find contradictions that rebut the SAC's allegations that Corporal

Painter did not have "any control" over the dog once it was released, and that the dog did not heed the commands of Corporal Painter. Painter Mem., at 9-10. A review of the BWC footage does not "utterly discredit" allegations that Corporal Painter did not have full control over the dog. Doriety, 109 F.4th at 679. Instead, it shows that Corporal Painter had to command the dog to return multiple times after it was first released into the apartment before it returned to him. Painter Mem., Ex. 1 at 00:54-01:20. Corporal Painter also asks that the BWC videos be considered in their entirety to show that Corporal Painter was acting within the context of an emergency as a contradiction to the allegation that Corporal Painter's use of force was "grossly disproportionate to any and all risk facing him at the time." Painter Mem., at 10-11 (citing SAC ¶ 86). That argument does not comport with the standard set forth by the Fourth Circuit in Doriety. The BWC footage is considered "*only to the extent* that the video 'clearly depicts a set of facts contrary to those alleged in the complaint[.]" 109 F.4th at 679-80 (emphasis added). Here, Corporal Painter is attempting to shoehorn all the BWC footage into the Doriety analysis by pointing to a wide-ranging, and conclusory, allegation in the SAC without pointing to specific facts that are being contradicted. Thus, the Court will not consider the contradictions concerning the larger emergency response or Corporal Painter's

13

control over the K-9 in its factual analysis for purposes of the MOTION.

Second, the remaining contradictions proposed by Painter are not supported by the BWC footage itself but are supported by the exhibits attached to the SAC. The introduction of those contradictions is governed by another analysis. We now consider that issue.

### B. Consideration of the Attached Exhibits

Williams attaches the following five (5) exhibits to the SAC: Exhibit A, CAD Report; Exhibit B, the Incident Full Report; Exhibit C, Photographs; Exhibit D, Chesterfield County Police Policy 2.2.04: Police Canine Teams (Effective March 12, 2024); Exhibit E, Guidance on Policies and Practices for Patrol Canines (Undated). Corporal Painter argues that the entirety of the exhibits, particularly Exhibits A and B, should be considered when analyzing the facts of this case, even when they conflict with the allegations laid out by the SAC. Painter Mem., at 1-2.

"In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011) (citing Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)). "[I]n the event of conflict between the bare allegations of the complaint

14

and any exhibit attached ..., the exhibit prevails." <u>Goines v.</u>
<u>Valley Cmty. Servs. Bd.</u>, 822 F.3d 159, 166 (4th Cir. 2016)
(alteration in original) (quoting <u>Fayetteville Inv'rs v.</u>
<u>Commercial Builders, Inc.</u>, 936 F.2d 1462, 1465 (4th Cir. 1991)).
That approach is predicated on "the presumption that the plaintiff,
by basing his claim on the attached document, has adopted as true
the contents of that document." <u>Id.</u> at 167. However, "before
treating the contents of an attached or incorporated document as
true, the district court should consider the nature of the document
and why the plaintiff attached it," and it should consider whether
the SAC relied on the attachment for its truthfulness. <u>See id.</u> at
167–69.

    The SAC directly incorporates each of the exhibits into the
SAC as supporting citations for allegations supporting Williams'
claim that Corporal Painter lacked any probable cause to search
the apartment and that the use of a K-9 unit on Williams during
that search violated Williams' constitutional rights under the
Fourth Amendment.[1] Williams specifically relies on the truthfulness
of the exhibits in order to bolster his claims. Consequently, the
Court finds that Williams has adopted as true the contents of the
exhibits that are attached to the SAC and adopts them as part of
the SAC. <u>See, e.g., Lawhon v. Edwards</u>, 477 F. Supp. 3d 428, 436

---

[1] <u>See</u> SAC ¶ 14, 19, 32, 62, 63, 64, 65, 66, 70, 71, 77, 79, 80.

fn. 8 (E.D. Va. 2020) (holding that the court would consider video attachments for their own truth when a complaint specifically incorporated the video attachments and relied on their truthfulness), aff'd sub nom. Lawhon v. Mayes, No. 20-1906, 2021 WL 5294931 (4th Cir. Nov. 15, 2021). Therefore, to the extent that the allegations of the SAC conflict with attached exhibits, the attached exhibits must prevail. Goines, 822 F.3d at 166.

Therefore, taking into consideration both the blatant contradictions presented by the BWC footage and the entirety of the attached exhibits, the facts properly before the Court on the MOTION are as follows.

**C. Facts**

On October 11, 2022, Sarah Kennedy arrived at her apartment located at 5741 Quiet Pine Circle, Apt 102, Chester, VA 23831. SAC ¶ 14, Ex. A. Finding that the apartment was locked, Kennedy kicked down the door and went to the bedroom at the rear of the apartment. SAC ¶ 14, Ex. A. Inside was Williams, lying in the bed. SAC ¶ 12. Williams had been given a key to the apartment and permission to stay there by Tyleek Harris, a former boyfriend of Kennedy. SAC ¶ 10, 13. Williams had been staying in the apartment for just under a month without incident.[2] SAC ¶ 11. Upon seeing Williams in the

---

[2] The Incident Report states that Ms. Kennedy had left her apartment on September 5, 2022, to live elsewhere. However, she informed officers that, despite no longer living in the apartment, she still

bed, Kennedy began yelling racial slurs and profanity towards him. SAC ¶ 13. Kennedy threatened Williams by telling him that she had a gun, and then she ran out of the apartment and contacted law enforcement. SAC ¶ 13.

The CCPD fielded that 911 call from Kennedy. SAC ¶ 14, Ex. A. During the call, Kennedy reported a breaking and entering in progress at her apartment located at 5741 Quiet Pine Circle. SAC ¶¶ 13, 14, Ex. A. Kennedy reported to CCPD that her apartment was locked, that she had kicked in the door, that someone was in her bed, that no weapons were seen, and that she was now waiting outside the apartment in a vehicle. SAC, Ex. A. She further reported that she was the only person who was on the lease for the apartment, and that she had not seen anyone leave the apartment since she had exited the building. SAC, Ex. A.

Kennedy's 911 call generated a report, the CAD Sheet (Ex. A), for the review of responding officers. The CAD Sheet gave an incident description of "BURG[LARY]" and "BREAKING AND ENTERING." Ex. A. Fourteen (14) CCPD officers were dispatched to the call. Ex. B. at 2. An unidentified officer spoke with Ms. Kennedy at the scene. Ex. B at 3. That officer verified that the apartment was Kennedy's address by checking her identification. Id. The officer

---

maintained the lease in her name. Ms. Kennedy then returned to the apartment on October 11, 2022, to get the rest of her belongings and move them out of the apartment. Ex. B at 3.

then confirmed the details of the 911 call. Id. Kennedy reported to the officer that she did not know the person inside the apartment and that no one else had a key to access the apartment. Id. At the same time, CCPD officers set up a perimeter around the apartment while waiting for K-9 assistance to arrive. Id. Corporal Painter then arrived on the scene with his dog. Id. Corporal Painter was shortly thereafter informed by Sergeant Eric Hvala that Kennedy had come home and found a naked, unknown man in her back bedroom. Id. Corporal Painter was then further apprised that no one was supposed to be in the apartment, and that Kennedy was the only individual on the lease. Id.

Corporal Painter went to the back door of the apartment and verified that it was closed. Id. He positioned himself at the threshold of the apartment door with his dog while Officer Wilson provided him with cover. SAC ¶ 24; Painter Mem., Ex. 1 at 00:45-00:51. Corporal Painter then pushed open the back door to the apartment and loudly announced, "police K-9, speak to me now or I'll release the dog, if the dog finds you, you'll be bit." Painter Mem., Ex. 1 at 00:52-57. There was a brief pause, around three seconds, in which no response was given. Id. at 00:57-01:00. Corporal Painter then announced, "police K-9, speak to me now." Id. at 01:00-01:02. No response was made, so Corporal Painter loudly asked, "anybody home?" Id. at 01:02-01:04. Corporal Painter gave a brief pause, but, again, no response was made. Id. at 01:04-

18

01:07. Corporal Painter then loudly announced, "now's your chance; speak up." Id. at 01:06-01:08. No response was given. Id. at 01:08-01:09.

Following these four warnings, Painter released the dog into the apartment, with a command to "find him." Id. at 01:09. The dog searched the living room and kitchen areas of the apartment and then returned to Corporal Painter. Id. at 01:10-01:17. After grabbing the dog's collar, Corporal Painter loudly announced for any individuals in the apartment to "come out now." Id. at 01:18-01:19. After a momentary pause, lasting about 2 seconds, Corporal painter released the dog into the apartment for a second time with the command to "find him." Id. at 01:19-01:26.

While the dog began moving toward the back of the apartment, Williams appeared out of the back bedroom located at the right side of the back hallway. Id. at 01:26. Upon seeing Williams, Officer Wilson stated loudly "let me see your hands" and then "keep your hands up." Id. at 01:26-01:28. While Officer Wilson gave that second command, the dog bit Williams on the upper left arm. Id. at 01:28; SAC ¶ 32. The dog proceeded to bite Williams several times. SAC ¶ 32, Ex. C. The SAC alleges that at no point during this encounter did Corporal Painter have control over the dog, nor did the dog listen to the commands of Corporal Painter. SAC ¶¶ 36-37.

Corporal Painter approached Williams while he was being bitten and ordered Williams to "get on the ground." Painter Mem.,

19

Ex. 1 at 01:28-01:38. Williams immediately complied. Id. Corporal Painter then grabbed the dog by both of its collars (a police collar and a metal pronged collar), and forcefully twisted the metal pronged collar while pulling backwards so that the dog would release its bite. Id. at 01:40-01:53. Once the dog released its bite, Corporal Painter pulled the dog back down the hallway. Id. at 01:54-02:00. Officer Wilson then approached Williams (who was still lying on the ground). Painter Mem., Ex. 2 at 8:00-8:10. Officer Wilson walked behind Williams and on multiple occasions commanded him to put his hands behind his back. Id. at 8:08-8:15. Other CCPD officers approached and assisted Officer Wilson with placing the handcuffs on Williams. Id. at 8:15-8:45.

**DISCUSSION**

### A. Legal Standard: Rule 12(b)(6)

"A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint, considered with the assumption that the facts alleged are true." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (cleaned up). Fed. R. Civ. P. 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (citing Bell Atl. Corp.

20

v. Twombly, 550 U.S. 544, 555 (2007)). The Court "must accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018). So, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 570. But, "[a]lthough for the purposes of [a] motion to dismiss [the Court] must take all the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. Twombly, 550 U.S. at 555, 127 S.Ct. 1955. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." Giacomelli, 588 F.3d at 193 (internal quotation marks omitted).

Where, as here, exhibits are incorporated into the SAC and there is video evidence that can be considered, the facts therein become part of the SAC. See E.I. du Pont de Nemours & Co., 637 F.3d at 448; see also Doriety, 109 F.4th at 679-80.

## B. Legal Standard: Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Courts apply a two-faceted test to determine whether an officer is entitled to qualified immunity. See Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Under the first facet, "a plaintiff must allege sufficient facts to set forth a violation of a constitutional right[.]" Sims v. Labowitz, 885 F.3d 254, 260 (4th Cir. 2018) (citing Pearson, 555 U.S. at 232, 129 S.Ct. 808). As to the second facet, "the court must conclude that this right was clearly established at the time of the alleged violation." Id. The Court may consider either facet of the test first. See Pearson, 555 U.S. at 236, 129 S.Ct. 808 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

## C. Analysis

The constitutional violation advanced by Williams is that Corporal Painter violated his Fourth Amendment right to be free

from unreasonable seizures and that Corporal Painter violated that right by subjecting him to excessive use of force when he deployed the dog and allowed it to bite Williams.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. One aspect in the bundle of rights guaranteed by the Fourth Amendment is the right to be free from the use of excessive force when being seized. See Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "To determine whether the force used was excessive, we apply a "standard of objective reasonableness.'" Putman v. Harris, 66 F.4th 181, 186 (4th Cir. 2023) (quoting Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002)).

In Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court created the operative standard for reviewing claims of excessive force brought under the Fourth Amendment, holding that the "test of reasonableness" requires careful attention to the particular facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. 1865. "The 'reasonableness' of a particular use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with 20/20 vision of hindsight." Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22 88 S.Ct. 1868, 1879-1881 20 L.Ed.2d 889 (1968)). And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." Id. at 396-397, 109 S.Ct. 1865.

Corporal Painter argues that Williams' excessive use of force claim fails the first facet of the qualified immunity test because deploying a police dog against an individual suspected of breaking and entering and burglary, after issuing five warnings prior to the dog's release to which no response was given, was objectively reasonable under the circumstances. Painter Mem., at 17-18. Williams responds that each of the Graham factors favors a finding that the force used in employing the dog was not objectively reasonable, and was, thus, in violation of his rights under the Fourth Amendment. Resp. at 7-10.[3]

---

[3] After reviewing the facts properly presented at this stage, a Rule 12(b)(6) motion to dismiss, the Court finds that more complete fact discovery would be necessary to decide whether a constitutional violation has occurred. There are facts before the Court because of the incorporation of the CAD Sheet and the Incident Report that seem to call for disposition of this issue. However, there are missing links between assertions made by Corporal Painter in his briefing pertaining to his personal knowledge at the moment that he seized Williams and what evidence

Corporal Painter further argues that Williams' case should be dismissed under the second facet of the qualified immunity test because the constitutional right advanced by Williams had not been clearly established.[4] Williams responds that the right to be free from excessive force under the circumstances before the Court has been clearly established by the Fifth Circuit's decision in Cooper v. Brown, 844 F.3d 517 (5th Cir. 2016). Courts may "address these questions in the order that would best facilitate the fair and efficient disposition of the case." Atkinson v. Godfrey, 100 F.4th 498, 504 (4th Cir. 2024) (citing Pearson, 555 U.S. at 236, 129 S.Ct. 808). That means that courts "may grant qualified immunity on the ground that the purported right was not clearly established without resolving the 'often more difficult question whether the purported right exists at all.' Id. (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)). "The

_____

is currently before the Court in the SAC and the attached exhibits. Particularly, the CAD Sheet and Incident Report, without supporting deposition testimony, cannot be used to fully assess what personal knowledge Corporal Painter had when he searched the apartment. Nor can any allegation in the SAC or the attached exhibit form the basis for Sergeant Hvala's knowledge that is purportedly imputed to Corporal Painter. Without such factual development, the collective-knowledge doctrine, as argued by Corporal Painter, cannot be applied. See United States v. Massenburg, 654 F.3d 480, 492-93 (4th Cir. 2011) ("holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself.").

flexibility in approaching the questions 'comports with [the Supreme Court's] usual reluctance to decide constitutional questions unnecessarily.'" Id. (quoting Reichle, 566 U.S. at 664, 132 S.Ct. 2088).

### i. Clearly Established Violation

Although the Court may consider either facet of the qualified immunity inquiry first, the Court will begin its analysis with the second facet—whether the constitutional right advanced by Williams has been "clearly established."[5] Atkinson, 100 F.4th at 504.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly, 580

---

[5] The Fourth Circuit has expressed a preference for courts to analyze the first facet before the second facet when the decision would address "questions that do not frequently arise" and "promote[] the development of constitutional precedent." Sims v. Labowitz, 885 F.3d 254, 260 (4th Cir. 2018) (citing Pearson, 555 U.S. at 236, 129 S.Ct. 808). Here, there are issues surrounding the first facet that require further factual development and cannot be properly adjudicated at this stage. Therefore, any analysis of the first facet would not promote the development of constitutional precedent on excessive force claims under the Fourth Amendment. See Pearson v. Callahan, 555 U.S. 223, 237, 129 S. Ct. 808, 819, 172 L. Ed. 2d 565 (2009) ("Although the first prong of the Saucier procedure is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development. For one thing, there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases.") (citing Scott v. Harris, 550 U.S. 372, 388, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (BREYER, J., concurring) (counseling against the Saucier two-step protocol where the question is "so fact dependent that the result will be confusion rather than clarity")).

U.S. 73, 78-79, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam). Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White, 580 U.S. at 79, 137 S.Ct., at 551 (alteration and internal quotation marks omitted).

The standard for a clearly established right is heightened in the context of an excessive use of force claim under the Fourth Amendment. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix v. Luna, 577 U.S. 7, 12, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (alteration and internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Id. at 13, 136 S.Ct., at 309

(internal quotation marks omitted and emphasis deleted). Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful. Id. at 18, 136 S.Ct., at 312 (internal quotation marks omitted). The Supreme Court has also held that "the general rules set forth in 'Garner and Graham do not by themselves create clearly established law outside an 'obvious case.'" Kisela v. Hughes, 584 U.S. 100, 105, 138 S. Ct. 1148, 1153, 200 L. Ed. 2d 449 (2018) (citing White, 580 U.S. at 80).

When assessing whether a constitutional right has been clearly established, courts "first examine 'cases of controlling authority in [this] jurisdiction,' that is, 'decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose.'" Booker v. S.C. Dep't of Corr., 855 F.3d 533, 538 (4th Cir. 2017) (internal citations and quotations omitted). Courts "'ordinarily' need not look any further than decisions from these courts. But when 'there are no such decisions from courts of controlling authority, we may look to a 'consensus of cases of persuasive authority' from *other jurisdictions*, if such exists.'" Id. at 538-539 (quoting Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004)) (internal citation omitted) (emphasis in original).

28

The first step in completing the analysis is setting the date of Williams arrest, October 11, 2022, as the relevant date from which the reasonableness of Corporal Painter's actions is measured.   Brosseau, 543   U.S.   at   198,   125   S.Ct.   596 ("reasonableness is judged against the backdrop of the law at the time of the conduct."). In the SAC, Williams refers to three cases as providing support for finding that, as of October 11, 2022, existing precedent clearly established that Corporal Painter violated his Fourth Amendment rights when using the dog in seizing Williams. However, Williams' opposition brief to the MOTION does not address any of those cases and relies solely on the Fifth Circuit's decision in Cooper v. Brown, 844 F.3d 517 (5th Cir. 2016) as the clearly established law that forecloses qualified immunity. The Court will first examine Cooper, then discuss the three cases cited in the SAC, and then finally survey precedent from the Fourth Circuit to determine whether the constitutional right has been clearly established.

In Cooper v. Brown, the Fifth Circuit held that the use of a dog was objectively unreasonable under specific circumstances. 844 F.3d 517 (5th Cir. 2016). In Cooper, an individual was driving his vehicle when he was pulled over by a police officer on suspicion of driving under the influence ("DUI"), a misdemeanor offense. Cooper, 844 F.3d at 521. The officer administered a breathalyzer test and then returned to his vehicle. Id.  At that moment, the

suspect fled on foot from the officer and hid in a small wood fenced area between two houses. Id. The officer decided not to pursue the suspect. Instead, he radioed for backup explaining that a DUI suspect had fled on foot. Id. The officer did not request a K-9 unit and testified that it would have been unusual for one to be deployed for a misdemeanor DUI offense. Id. A responding officer brought his dog in pursuit of the suspect, and the dog located and then bit the suspect. Id. The dog continued biting the suspect for "one to two minutes." Id. During that time, the suspect did not attempt to flee or strike the dog. Id. While the dog continued biting the suspect, the responding officer ordered the suspect to show him his hands and to submit to him. Id. The responding officer could tell that the suspect had no weapon. Id. The suspect was then ordered to roll onto his stomach, a command which the suspect complied with while the officer handcuffed him. Id. It was only after the suspect was handcuffed that the dog was ordered to release its bite. Id. As a result of the bite, the suspect "suffered years of severe pain from lower-leg injuries that required multiple surgeries, including reconstruction and skin grafts."[6] Id.

---

[6] The extent of the injuries is a factor taken into consideration in the analysis of whether an officer's actions were objectively reasonable under Graham. See Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). While not discussed by the court in Cooper, this fact would also lead to a distinction to the present case because the SAC does not allege that Williams suffered grievous injuries.

Based on those facts, the Fifth Circuit found that the officer's use of force was objectively unreasonable under on the Graham factors. For the first factor, it was held that the factor favored the officer because a DUI is a serious offense. Id. at 522. For the second factor, the court found that no reasonable officer could conclude the suspect posed an immediate threat to the officer or others because he was not suspected of committing a violent offense and the officer knew the suspect did not have a weapon because he could see his hands. Id. For the third factor, there was no evidence that the suspect was attempting flee as the suspect quickly complied with an order to roll over onto his stomach showing that he was "actively complying" with police. Id. Finally, the court focused on the fact that there was no reason for the dog to continue biting once the suspect had rolled over onto his stomach. Id. at 523-24. Altogether, these factors lead to a finding that the officer's actions were objectively unreasonable. Id. at 524 ("we state only the obvious: Under the facts in this record, permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable").

Based on these facts and findings, The Fifth Circuit held that the constitutional right of the suspect had been clearly established, and that right was "once an arrestee stops resisting, the degree of force an officer can employ is reduced." Id. at 524-

31

25. The Fifth Circuit found that clearly established right in two previous Fifth Circuit decisions in which individuals were subjected to serious harm *after* it was made clear they were not resisting arrest or attempting to flee. Id. (citing Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008) (holding that it was objectively unreasonable for an officer to slam an arrestee's face into a nearby vehicle when the arrestee "was not resisting arrest or attempting to flee"); Newman v. Guedry, 703 F.3d 757, 762 (5th Cir. 2012) (finding that the use of a taser was objectively unreasonable where videos did not show the arrestee "attempting to strike either officer, holding a weapon, or even reaching for his waistband.")).

In Cooper, the Fifth Circuit also relied upon two Eleventh Circuit decisions which held that dog bites that were allowed to continue for two minutes and five to seven minutes, respectively, on suspects who were not resisting arrest were objectively unreasonable. Id. at 525 (citing Priester v. City of Riviera Beach, 208 F.3d 919, 923-24 (11th Cir. 2000); Edwards v. Shanley, 666 F.3d 1289 (11th Cir. 2012)). The overarching, and for Williams insurmountable, issue is that Cooper is not factually in line with what happened in this case. The crux of those cases is that dogs were allowed to continue biting suspects after officers were aware that they were not resisting arrest. The officer in Cooper allowed the dog to continue its bite for one to two minutes after it was

clear that the suspect did not present a threat, and even allowed the bite to continue after the suspect was handcuffed. See Cooper, 844 F.3d at 521. The cases that Cooper cites in support of its holding are similarly focused on the excessive use of force in allowing a dog to continue its bite after it was no longer necessary to do so. See Edwards v. Shanley, 666 F.3d 1289, 1297-98 (11th Cir. 2012) (concluding that, while it is constitutional to use a dog to track and subdue a fleeing suspect, it is clearly established that ordering a five to seven-minute dog attack against a compliant suspect who is pleading to surrender violates the Fourth Amendment); Priester v. City of Riviera Beach, 208 F.3d 919, 925-27 (11th Cir. 2000) (concluding that qualified immunity was precluded because "every reasonable officer," in the officers position, would "conclude the force was unlawful" where the officers released a canine on a compliant and unresisting suspect and then stood and watched "for an eternity" while the dog attacked the suspect on both legs).

The facts of those cases do not align with the facts alleged in the SAC and the exhibits, and the video evidence in this case. Here, the dog bit Williams within two seconds after he came out of the back bedroom. Painter Mem., Ex. 1 at 01:26-01:28. The bite happened so quickly that it occurred while Officer Wilson was still giving initial commands for Williams to "keep your hands up." Id. at 01:28-01:53. Corporal Painter turned his flashlight on to see

33

the dog biting Williams, and then immediately moved towards Williams with his gun drawn. Id. While walking towards Williams, Corporal Painter commanded him to "get on the ground," to which Williams immediately complied. Id. Corporal Painter then, before Williams was handcuffed, grabbed the dog by its collars and forced the dog to release its bite. Id. The bite lasts for, at maximum, a total of 25 seconds. Id. More than half of that time, a 13-second period, involves Corporal Painter taking action to have the dog release its bite. See id. at 01:40-01:53. Further, Corporal Painter immediately moved to remove the dog once Williams complied with his order to get on the ground. Id. at 01:28-01:53. Once the dog was removed, Williams remained on the ground and was handcuffed by Officer Wilson and other CCPD officers. Painter Mem., Ex. 2 at 07:50- 08:45. The facts presented by the SAC, the exhibits and the video are not remotely like those in Cooper, which involved the continued exercise of a dog after it was no longer necessary for such force to continue. Here, 12 seconds passed between the dog bite and when Corporal Painter began to remove the dog, and those 12 seconds consisted in a large part of Corporal walking toward Williams and assessing the level of threat that Williams presented. Therefore, Cooper, and the cases it cites, do not clearly establish

the constitutional violation advanced in this case.[7] <u>Mullenix</u>, 577 U.S. at 12, 136 S.Ct. at 308 ("[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.").

The SAC cites three cases to state an excessive use of force claim: 1) <u>McKinney v. City of Middletown</u>, 49 F.4th 730 (2nd Cir. 2022); 2) <u>Becker v. Elfreich</u>, 821 F.3d 920 (7th Cir. 2016); and 3) <u>Callaway v. Akron Police Dep't</u>, 183 N.E.3d 1 (Ct. App. 2021). None of them clearly establish a rule that Corporal Painter violated.

The SAC first relies upon <u>McKinney</u>, a Second Circuit decision, for the proposition that "Federal Courts have held that using a dog to bite and hold a suspect who posed no immediate threat constitutes excessive force." SAC ¶ 57 (citing <u>McKinney v. City of Middletown</u>, 49 F.4th 730 (2nd Cir. 2022)). But that is not what <u>McKinney</u> held. In <u>McKinney</u>, the plaintiff "threatened, attacked, and resisted the defendant officers as they tried to subdue him so that he could be transferred to a different cell." 49 F.4th at 739. In response, officers made "incremental and combined uses of a baton, a canine, and a taser [] in response to McKinney's

---

[7] <u>Cooper</u> is an out-of-circuit decision and is not supported by the robust consensus of persuasive authority that is required to clearly establish a constitutional violation. <u>See</u> <u>Booker v. S.C. Dep't of Corr.</u>, 855 F.3d 533, 538 (4th Cir. 2017).

resistance[.]" Id. The Second Circuit, in view of those facts, held that there was no "controlling authority" or "robust consensus of cases of persuasive authority" that clearly established that those facts presented a constitutional violation through an excessive use of force. Id. Not even the District Court whose decision was on appeal in McKinney had decided whether the specific circumstances it was confronted with constituted an excessive use of force under the Fourth Amendment, but only that the constitutional right at issue (the right to be free from excessive force) had not been clearly established as to the particular facts of that case.[8] McKinney, 2019 WL 10255235, at *10. And it was that holding on a clearly established violation that was subsequently affirmed. McKinney, 49 F.4th at 739.

---

[8] The District Court of Connecticut's decision that was appealed in McKinney v. City of Middletown, 49 F.4th 730, 739 (2d Cir. 2022) solely discussed the second facet of qualified immunity. See McKinney v. City of Middletown, No. 3:12-CV-00337(AVC), 2019 WL 10255235, at *10 (D. Conn. May 20, 2019), adhered to on reconsideration, No. 3:12-CV-00337(AVC), 2019 WL 10255237 (D. Conn. June 19, 2019), and aff'd, 49 F.4th 730 (2d Cir. 2022), and aff'd, 49 F.4th 730 (2d Cir. 2022). The District Court focused on the decisions of Cooper, Edwards, and Priester holding that it is clearly established that "an officer can not deploy a canine on persons who are compliant and not actively resisting," and found that these holdings were not sufficiently factually similar to allow the claim for excessive force to continue past a motion for summary judgment. Id. at *11 (citing Cooper, 844 F.3d at 524; Edwards, 666 F.3d 1289; Priester, 208 F.3d 919).

36

The Plaintiff fares no better in citing Becker v. Elfreich, 821 F.3d 920 (7th Cir. 2016). In Becker, the Seventh Circuit confronted a claim that an officer had acted unreasonably when allowing a dog to continue biting an individual after "he had surrendered with his hands on his head," and also "used excessive force by pulling him down the steps and placing his knee on his back while allowing [the K-9] to continue to bite him." 821 F.3d at 924-25. The Seventh Circuit found that, in view of the totality of the circumstances considered under Graham, that "it was unreasonable for [the officer] to pull [the plaintiff] down three steps and place a knee in his back while allowing [the K-9] to violently bite his leg." Id. at 928-29. Once again, there is a fundamental difference between Becker and this case because, based on the BWC footage, the use of force (the dog) was stopped immediately after Williams got on the ground and signaled to Corporal Painter that he presented no risk of harm or flight. See Painter Mem., Ex. 1 at 01:28-01:53. Further, the BWC footage shows that Corporal Painter gave several warnings into the apartment, and asked for a response, before deploying the dog. See id. at 00:54-01:20.

Finally, the SAC cites Callaway v. Akron Police Dep't, 183 N.E.3d 1 (Ct. App. 2021) wherein the Court of Appeals of Ohio examined whether an  officer could be held responsible for wanton and reckless conduct in a manner that would preclude the application of Ohio's statutory immunity provision, Ohio Revised

Code § 2744.02(A)(6)(b). 183 N.E.3d at 8. The SAC here alleges that "the court discussed a situation where a police dog entered an apartment and bit an innocent person, emphasizing the need for officers to be aware of who is inside and the potential risks involved." SAC ¶ 59. While that may be true, it has nothing to do with clearly establishing the constitutional right asserted in this case. An analysis of whether a K-9 officer acted in a reckless or wanton manner for purposes of a state law immunity claim is of little persuasive effect in deciding whether a constitutional right under the Fourth Amendment has been established. Moreover, the facts of Callaway are materially different because that case concerned a police dog that ran into the apartment of an individual who was not suspected of any crime and bit her. Callaway, 183 N.E.3d at 3. Here, Corporal Painter approached an apartment where there was an ongoing investigation into a breaking and entering or burglary, and he made five warnings before releasing the dog into the apartment. Painter Mem., Ex. 1 at 00:54-01:20; SAC, Ex. A.

Williams has cited no Fourth Circuit or the Supreme Court authority in support of his clearly established law position. A review of available Fourth Circuit precedent, decided before October 11, 2022, reveals that on-topic cases from the Fourth Circuit have mostly focused on whether the law enforcement officer has provided any verbal warning before releasing a dog. See, e.g., Melgar ex. rel. Melgar v. Greene, 593 F.3d 348, 358-59 (4th Cir.

38

2010) (holding that an officer did not violate clearly established law "by failing to give a verbal warning" where a police dog was being used to search for a missing boy and had been kept on a leash); Maney v. Garrison, 681 F. App'x 210, 216-23 (4th Cir. 2017) (holding that a police officer's failure to give warning before approaching an abandoned house with a leashed police dog where officer believed a robbery suspect was hiding did not violate clearly establish right); Kopf v. Wing, 942 F.2d 265, 268-69 (4th Cir. 1991) (allowing a claim to proceed past summary judgment on the issue of objective reasonableness where there was a genuine dispute of material fact whether any verbal warning had been given before the use of a dog, "because a forewarning that the dog is going to attack, which provides the suspects a fair chance to surrender, is more reasonable than a surprise assault."); Vathekan v. Prince George's Cnty., 154 F.3d 173, 180 (4th Cir. 1998) (allowing an excessive use of force claim to survive summary judgment where there was a genuine issue of material fact on whether the officer had given a verbal warning before deploying the dog); Est. of Rodgers ex rel. Rodgers v. Smith, 188 F. App'x 175, 182 (4th Cir. 2006) ("Kopf and Vathekan stand at most for the principle that the Fourth Amendment is violated when an officer who faces no immediate threat deploys a police dog without prior warning.").

In 2023, the Fourth Circuit addressed the issue of objective reasonableness of the deployment of a police dog in detaining a suspect who was not acting in a violent manner. In Putman v. Harris, the Fourth Circuit held that the use of a dog in detaining an individual did not establish a constitutional violation, even when the harmed individual was not acting in a violent manner, where the officer was faced with "facts from which an officer could reasonably conclude that the resistance presents some immediate danger despite its non-violent character." 66 F.4th 181, 188 (4th Cir. 2023) (quoting Armstrong v. Vill. Of Pinehurst, 810 F.3d 892, 905 n.9 (4th Cir. 2016)). Other Fourth Circuit opinions have also held that individuals have failed to establish a constitutional violation in the use of a police dog under their specific facts. See Jones v. Wild, 244 F. App'x 532, 533 (4th Cir. 2007)("Because [the plaintiff] reached into his car after being commanded to put his hands up, and an officer gave a verbal warning prior to releasing the dog, the facts in the record, even when viewed in [plaintiff's] favor, fail to support the conclusion that the police dog was unreasonably deployed."); Est. of Rodgers ex rel. Rodgers, 188 F. App'x at 182 (officer acted with objective reasonableness even when deploying a police dog without a verbal warning where the defendant had kidnapped his girlfriend at gun point).

When comparing the facts of this case to all located Fourth Circuit precedent on the deployment of police dogs, the Court is unable to find that there is any Fourth Circuit precedent that clearly establishes the constitutional right asserted by Williams with the requisite specificity. Mullenix, 577 U.S. at 12, 136 S.Ct. at 308. Corporal Painter is entitled to receive qualified immunity under the second facet of the test promulgated by the Supreme Court in Pearson. 555 U.S. at 232, 129 S.Ct. 808. Therefore, COUNT I will be dismissed with prejudice.

## C. COUNTS II and III: Assault and Battery

The SAC also asserts Virginia common law claims of assault (COUNT II) and battery (COUNT III) arising from Corporal Painter's deployment of the police dog. SAC ¶ 100-107, 108-117. COUNTS II and III are predicated upon the same allegations that underly COUNT I, the excessive use of force claim. Id.

Williams' assault and battery claims—and Corporal Painter' possible entitlement to immunity from such state law claims as a law enforcement officer—are governed by Virginia law. See Gray-Hopkins v. Prince George's County, 309 F.3d 224, 232 (4th Cir. 2002). Under Virginia law, battery is defined as "an unwanted touching which is neither consented to, excused, nor justified." Koffman v. Garnett, 574 S.E.2d 258, 261 (Va. 2003) (citations omitted). An assault is defined as "an act intended to cause either harmful or offensive contact with another

41

person or apprehension of such contact and that creates in that other person's mind a reasonable apprehension of an imminent battery." Id. (citing Restatement (second) of Torts § 21 (1965)).

Under Virginia common law, "a law enforcement officer enjoys "special protection" from tort liability, such as for a battery, when he or she is performing his or her duties in a lawful manner." Best v. Farr, 2023 WL 2975648, at *5 (Va. Ct. App. Apr. 18, 2023) (citing Mercer v. Commonwealth, 150 Va. 588, 599 (1928)); see also Parker v. McCoy, 212 Va. 808, 813 (1972) ("[A police] officer is within reasonable limits the judge of the force necessary under the circumstances, and he cannot be found guilty of any wrong, unless he arbitrarily abuses the power conferred upon him."). Actions that otherwise would constitute an assault or battery are permitted when justified in the performance of a law enforcement officer's duties. See Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009) ("Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties.").

Virginia law provides a different standard for police officer immunity from tort than that of the standard for qualified immunity under § 1983. Therefore, the Court, having concluded that the federal claim is to be dismissed, declines to entertain COUNTS II and III. They will be dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, the MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (ECF No. 33) will be GRANTED and COUNT I will be dismissed for failure to state a claim upon which relief can be granted because the Defendant, Corporal Painter, is entitled to qualified immunity. COUNT I will be dismissed with prejudice and without leave to amend. The Court declines to exercise jurisdiction over the state law claims and thus COUNTS II and III shall be dismissed without prejudice.

It is so ORDERED.

/s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 17, 2025

43